## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No.  _____

**SUSAN R. YOSHIOKA, an Individual,**

     **Plaintiff,**

**v.**

**E.I. DUPONT DE NUMOURS & COMPANY, a Delaware Corporation,**

     **Defendant.**

---

### CLASS ACTION COMPLAINT FOR
### INJUNCTIVE AND MONETARY  RELIEF
### (Jury Trial Demanded)

---

Class Representative Plaintiff, Susan R. Yoshioka, on her own behalf and on behalf of all other Class members, by and through their undersigned counsel, hereby file this Class Action Complaint for Injunctive and Monetary Relief against Defendant, E.I. DUPONT DE NUMOURS & COMPANY ("DuPont"), and allege:

## I.  INTRODUCTION

1.　　This is a class action seeking monetary and other relief arising from DuPont's deceptive and unfair trade practices in failing to disclose to the consuming public the potential for serious public health, safety and welfare issues resulting from its manufacture and sale for over fifty (50) years of a product commonly known as "Teflon."  Cooking products containing Teflon can release harmful and dangerous substances, including a chemical that has been determined to be "likely" to cause cancer in humans.

2.      DuPont manufactured and distributed Teflon when it knew or should have known that Teflon contains substances that were dangerous and harmful to the public that can be released when cooking products made with Teflon are used for their intended purposes.

3.      This action is brought to require DuPont (i) to pay damages to the Plaintiff Class Representative and other Class Members who are purchasers of cooking products containing DuPont's Teflon product; (ii) to create a fund for ongoing medical monitoring of consumers who have purchased cooking products containing Teflon; (iii) to create a fund for independent scientific researchers to further investigate the potential for adverse health effects to consumers who have used cooking products containing Teflon; and (iv) to require that DuPont provide a warning label on cooking products regarding the potential adverse and harmful effects of Teflon.

## II.  JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C.A. §1332 (a)(1) and (d)(2) in that this action seeks monetary relief in excess of $5,000,000.00, exclusive of interest, costs and attorney's fees and is between citizens of different States.

5.      Venue is appropriate in this judicial circuit pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in the  District of Colorado.

## III.  REPRESENTATIVE CLASS PLAINTIFF

6.      Plaintiff, Susan R. Yoshioka, is a resident of Denver County, Colorado and is a consumer of cooking products containing or made with DuPont's Teflon product.

## IV.  DEFENDANT

7.      DuPont is a Delaware corporation.  DuPont sells or distributes Teflon throughout the State of Colorado.

8.      DuPont is in the business of manufacturing and supplying Teflon for distribution, marketing, wholesaling and retailing in various products made for consumer use.  Included among these products are housewares, household appliances, and cooking products such as pots and pans.

9.      Defendant DuPont is subject to the jurisdiction of this Court pursuant to C.R.S. 13-1-124.

10.      DuPont is engaged in substantial and not isolated activity in this state; all as more fully alleged herein.

## V.  BACKGROUND AND GENERAL ALLEGATIONS

11.      DuPont was founded in 1802.

12.      DuPont operates in more than seventy (70) countries.

13.      Teflon was invented in 1938 at DuPont's Jackson Laboratory.

14.      Teflon is DuPont's trademarked name for the chemical polytetrafluoroethylene (PTFE).

15.      DuPont has registered the Teflon trademark in 19 countries and first began selling Teflon commercially in 1946.

16.      As DuPont proudly boasts in its Teflon website:

> Teflon is really everywhere.  Not only can you find it in your clothes and on your cookware, but you can also find it on products on almost every continent.

17.     Teflon is commonly found in "non-stick" cooking products, such as in pots and pans, stir fryers and woks, pizza pans, breadmakers, cookie sheets, griddle pans and skillets, wafflers, deep fryers, crock pots, roasting pans, cake pans and molds, and other common cooking utensils and aids.

18.     Teflon and the chemicals used in its production represent a $2 billion per year industry.

19.     DuPont nets an estimated $200 million per year from its sale of Teflon.

20.     DuPont has advertised and represented to the public that Teflon makes life easy, and reportedly has called Teflon a "housewife's best friend."

21.     DuPont claims on its Teflon website that "the Teflon brand is one of the world's most recognized and respected of all ingredient brands" and that Teflon enhances consumer recognition.

22.     During the last fifty (50) years, DuPont's scientists have studied whether products containing Teflon are safe for use by consumers.  DuPont has continually represented to consumers in public statements and documents, in press releases and on its websites that Teflon is safe for consumer use and has denied that the use of cooking products containing Teflon can be harmful to human health.

23.     Perflourooctanoic acid ("PFOA") is a perflourinated detergent/surfactant that is manufactured, processed, and/or distributed by DuPont in connection with its manufacture of Teflon.  PFOA is also sometimes referred to by DuPont as C-8.

24.     PFOA is the chemical used to give Teflon its "non-stickiness."

25.     PFOA is a liver toxin in animals, is biopersistent in humans and animals and bioaccumulative in humans.

26.     PFOA is associated with other health concerns in animals, including cancer and developmental defects.

27.     PFOA is not naturally occurring but is nonetheless found to contaminate the blood of humans in all geographic regions of the United States.

28.     For example, a study released in 2001 by 3M Corporation found that PFOA was present in the blood of ninety six percent (96%) of the 598 children tested.  The children were located in 23 states.

29.     Studies have indicated that PFOA causes developmental toxicity and other adverse effects in animals.

30.     DuPont has conducted both animal and human studies and tests on PFOA.

31.     DuPont has continually represented to consumers in public statements and documents, in press releases and on its websites that there is no danger posed by PFOA when using cooking products coated with Teflon and has denied that the use of cooking products coated with Teflon can be harmful to human health.

32.     In 1981, however, 3M, a manufacturer of PFOA, advised DuPont that PFOA may cause birth defects in laboratory animals.

33.     Also in 1981, DuPont possessed a document describing the results of a blood sampling study DuPont conducted on eight (8) of its pregnant employees employed at the plant where PFOA is manufactured.  This document identified the levels of PFOA in the blood of DuPont's pregnant employees and described the status of the child.

34.     A purpose of DuPont's blood sample study was to monitor these pregnant employees for PFOA exposure, and to monitor umbilical cord blood for the presence of PFOA and to test the babies' blood for the presence of PFOA.

35.     The 1981 document demonstrates the presence of PFOA in the umbilical cord blood of at least one of the eight (8) DuPont employees and in the blood of another worker's baby.  Thus, DuPont knew or should have known from this study that PFOA moved from the mother, through the placenta, to the fetus.

36.     In 1982, DuPont reported data to the EPA regarding the transplacental movement of PFOA in rats.  The EPA considered this information to be "substantial risk data."  DuPont failed to disclose to the EPA (or to consumers), however, that it had obtained human blood sampling data in 1981 that confirmed the transplacental movement of PFOA in humans and further failed to disclose to the EPA the information it had about the presence of birth defects (described below) in the babies of its female workers exposed to PFOA.

37.     The EPA contends that DuPont's human blood sampling information demonstrating the transplacental movement of PFOA "reasonably supports the conclusion that PFOA presents a substantial risk of injury to human health."

38.     More specifically, the EPA contends that DuPont's human blood sample data demonstrating that PFOA crosses the human placental barrier between PFOA exposed mothers and their fetuses suggests that the fetuses could experience toxic effects from PFOA, including bioaccumulation and, as observed in animal tests, developmental toxicity and liver toxicity.

39.     The EPA considers DuPont's human blood sampling information that confirms transplacental migration of PFOA "to reasonably support the conclusion of a substantial risk of injury to health or to the environment."

40.     Moreover, the EPA considers DuPont's blood sample data confirming the transplacental movement of PFOA to be "known toxicological information" about PFOA.

41.     Additionally, documents maintained by DuPont chronicling the health of babies born to DuPont workers exposed to PFOA indicate birth defects in two (2) of seven (7) babies. One child had eye and tear duct defects and the second had nostril and eye defects.

42.     Among other things, as a result of DuPont's failure to disclose its 1981 blood sample data to the EPA, the EPA launched an investigation into DuPont's concealment of its study information and determined that DuPont engaged in unlawful behavior by concealing the blood sample study results.

43.     DuPont's concealment of its 1981 blood sample study information may well have altered the continued commercialization of Teflon and the profits received by DuPont from its sale of Teflon.  As the EPA pointedly states in its complaint against DuPont contending that DuPont violated the Federal Toxic Substances Control Act from June 1981 to March 2001 by not reporting health risks from exposure to PFOA:

> [the EPA's efforts to investigate the risks posed by PFOA] might have been more expeditious had the data on transplacental movement of the chemical in humans been submitted immediately by DuPont when DuPont obtained the information in 1981.

44.     DuPont has settled the claims brought by the EPA claiming it violated the Federal Toxic Substances Control Act.

45.     In May, 2005, however, a federal grand jury from the Justice Department's Economic Crimes Section issued a subpoena to DuPont regarding DuPont's use of PFOA.

46.     There are numerous additional facts and studies that demonstrate that exposure to PFOA causes adverse health effects.  PFOA has been linked to cancer, organ damage, and other negative health effects in tests on laboratory animals.  For example, male and female rats and mice have developed several different kinds of tumors when exposed to PFOA.

47.     Various studies have confirmed that exposure to PFOA causes or may cause vascular disease.  For example, it is reported that workers exposed to PFOA at 3M's plant in Cottage Grove, Minnesota, demonstrated a statistically significant, elevated risk of dying from cerebrovascular disease. Findings of vascular disease have also been reported in a study of DuPont workers exposed to PFOA.  Additionally, DuPont's study of the blood of its workers demonstrates a statistically significant correlation between cholesterol and PFOA.  Similarly, there was also a statistically significant correlation between cholesterol and PFOA found in a study of Italian workers exposed to PFOA.  Moreover, there are animal studies showing changes in blood chemistry associated with PFOA exposure that bolster these human study results.

48.     Studies have also shown that exposure to PFOA correlates to incidences of prostate cancer.  For example, workers at 3M's Cottage Grove plant exhibited a statistically significant association between the length of workplace PFOA exposure and prostate cancer mortality.  Moreover, an elevated risk of dying from prostate cancer was found among certain workers exposed to PFOA.  Additionally, workers at 3M's Decatur, Alabama, plant exhibited an increase in demand for medical care for male reproductive cancers (including prostate) compared

to the general population, with the greatest increases among those workers in the long-time, high-PFOA-exposure category.

49.     There are numerous other studies demonstrating many potential health risks related to exposure to PFOA.  Some of these studies include:

(a)     Two analyses of leukemia incidence were conducted from 1956-1989 showing statistically increased odds ratios for workers in DuPont's Washington Works plan from 1956-1989.  Additionally, a general mortality study found an increase in leukemia.

(b)     Workers exposed to perfluorochemicals at 3M's Decatur, Alabama plant exhibited significantly increased numbers of episodes of care for intestinal tumors versus those not exposed occupationally.  An elevated increase of risk of dying from cancer of the large intestine was also seen in those exposed to PFOA in 3M's Cottage Grove, Minnesota plant compared to the general population.

(c)     At 3M's Cottage Grove, Minnesota plant an elevated risk of dying from pancreatic cancer or pancreatic disease was seen among workers exposed to PFOA versus those not exposed occupationally.

(d)     At 3M's Cottage Grove, Minnesota, plant an elevated risk of dying from cancer of the testis or other male reproductive cancers was seen among workers exposed to PFOA versus those not exposed occupationally.

(e)     A 3M-sponsored animal study found a statistically significant increase in fibroademonas (mammary tumors) correlated with PFOA dose.

(f)     There are also studies that demonstrate PFOA may be related to adverse pituitary effects and immunological function.

50.     Over 40 years ago, DuPont conducted human experiments with Teflon-laced cigarettes to determine why certain workers were becoming sick on the job with a Teflon-related illness commonly called Polymer Fume Fever.  DuPont laced the cigarettes of its volunteers with Teflon and had the volunteers inhale the cigarette fumes until they became sick.  In these dosing experiments up to 90% of the people in the highest dose group became ill for an average of 9 hours, demonstrating flu-like symptoms, including chills, back ache, fever and coughing.  These

symptoms are commonly linked to Polymer Fume Fever.  DuPont acknowledges that Teflon fumes can sicken people, causing Polymer Fume Fever.

51.     Moreover, apparently aware of the adverse effects in humans of inhaling heated Teflon, DuPont required its employees to wear respirators when working with Teflon heated to 400°F (or more) while in poorly ventilated areas.  Experiments demonstrate that when cooking in the home, the surface of a Teflon coated pan can reach this temperature within 2 minutes using a conventional stove top burner set on high.

52.     Reports indicate that a Teflon coated pan reached 721ºF in just five minutes under the same test.  DuPont studies show that Teflon emits toxic particulates at 446°F.  At 680°F Teflon coated pans release at least six toxic gases, including two carcinogens, two global pollutants, and MFA, a chemical lethal to humans at low doses.  At temperatures that DuPont scientists claim are reached on stovetop drip pans (1000ºF), non-stick coatings break down to a chemical warfare agent known as PFIB, and a chemical analog of the WWII nerve gas *phosgene*.

53.     For the past fifty years DuPont has claimed that their Teflon coatings do not emit hazardous chemicals through normal use.  In a recent press release, DuPont wrote that "significant decomposition of the coating will occur only when temperatures exceed about 660 degrees F (340 degrees C).  These temperatures alone are well above the normal cooking range."  Reported tests show, however, that Teflon coated cookware exceeds these temperatures through the common act of preheating a pan on a burner set on high.  The toxic particles and gases emitted when Teflon heats and the temperatures at which these particles and gases are first emitted, follow:

> 464ºF – Ultrafine particulate matter:  Teflon produces very small (ultrafine) particles which cause extreme lung damage to rats within 10 minutes of exposure.

Longer exposure causes death.

680ºF – Tetrafluoroethylene (TFE): The National Toxicology Program considers *tetrafluoroethylene* (TFE) to be a "reasonably anticipated" human carcinogen because it is known to cause cancer in laboratory animals.

680ºF – Hexafluoropropene (HFP): Exposure to fluorocarbons like HFP can lead to eye, nose and throat irritation; heart palpitations, irregular heart rate, headaches, light-headedness, fluid accumulation in the lung and possibly death. Long-term exposure is associated with decreased motor speed, memory and learning.  In mice and rats, inhalation of hexafluoropropene (HFP) causes kidney lesions, decreased numbers of a type of immune cell and increased urination. HFP also causes increased numbers of chromosomal abnormalities in hamster ovaries.

680ºF – Difluoroacetic acid (DFA):  Kidney toxicity from DFA has been reported in rats.

680ºF – Monofluoroacetic acid (MFA, fluoroacetic acid or compound 1080): Monofluoroacetic acid is toxic.  Doses as low as 0.7 to 2.1 mg/kg can kill people. Initially, people report nausea, vomiting, numbness, tingling, anxiety, muscle twitching, low blood pressure and blurred vision.  If exposure is high enough, people can have irregular heart rate, heart attacks and severe convulsions leading to respiratory failure.

680ºF – Perfluorooctanoic acid (PFOA):  The effects of PFOA are discussed throughout this Complaint.

878ºF – Silicon tetrafluoride (SiF4):  Silicon tetrafluoride is a highly toxic, corrosive gas.  In the lungs, moisture causes the silicon particles to separate, releasing toxic hydrofluoric acid and also coating the lung with silicon particles. Inhaling hydrofluoric acid can cause eye and throat irritation, cough, difficult breathing, bluish skin color caused by lack of oxygen, lung damage and fluid accumulation in the lung.  Long term exposure can cause weight loss, decreased numbers of red and white blood cells (anemia and leucopenia*)*, discoloration of the teeth and abnormal thickening of the bone.

887ºF – Perfluoroisobutene (PFIB):  Perfluoroisobutene (PFIB) is toxic. Inhalation can lead to fluid build up in the lung, a condition that can lead to death. PFIB is listed in the Chemical Weapons Convention as a *Schedule 2 compound*. PFIB is many times more toxic than phosgene, a highly toxic corrosive gas also listed as a chemical weapon.

932ºF – Carbonyl fluoride (COF2):  Breakdown of Teflon in the air is the major source of carbonyl fluoride exposure.  Carbonyl fluoride is the fluorine version of

phosgene, a chlorinated chemical warfare agent.  Carbonyl fluoride fumes can irritate eyes, ears and nose.  More serious symptoms of exposure include chest pains, breathing difficulty, fluid accumulation in the lungs, weakness, liver damage and increased glucose levels.

932ºF – Hydrogen fluoride (HF):  Hydrogen fluoride (HF) is a toxic corrosive gas, and can cause death to tissue it comes into contact with, including tissue in the lungs.  Breathing HF can cause severe lung damage, such as fluid buildup in the lungs and inflammation of lung passages.

1112ºF – Trifluoroacetic acid fluoride (CF3COF):  Trifluoroacetic acid fluoride is toxic when it breaks down into hydrogen fluoride and trifluoroacetic acid.

1112ºF – Octafluorocyclobutane (OFCB):  Inhaling high levels of octafluorocyclobutane can cause heart beat irregularities, unconsciousness and death.  People with pre-existing heart conditions may be extra vulnerable.

54.     The EPA has recently identified significant human health concerns from exposure to PFOA.

55.     On June 27, 2005, a panel of the EPA's Science Advisory Board ("SAB") released a draft of its conclusions after reviewing the EPA's report entitled "Draft Risk Assessment of the Potential Human Health Effects Associated with Exposure to Perfluorooctanoic Acid (PFOA)."

56.     A majority of members of the EPA's SAB concluded that PFOA was likely to cause cancer in humans.  The SAB stated:

> that the experimental weight of the evidence with respect to the carcinogenicity of PFOA was stronger than [previously determined by the EPA], and suggested that **PFOA is a 'likely' carcinogen in humans**.  According to the EPA's Guidelines for Carcinogen Risk Assessment (also known as  EPA's  Cancer Guidelines), this descriptor is typically applied to agents that have tested positive in more than one species, sex, strain, site or exposure route, with or without evidence of carcinogenity in humans.

57.     DuPont executives nonetheless continue to claim that the use of Teflon in cooking products is completely safe.

# VI.  CLASS ACTION ALLEGATIONS

58.     A class action is appropriate pursuant to Fed. R. Civ. P. 23 (a), 23(b)(1)(A) and (B) and 23(b)(3).

59.     The Class that Plaintiff represents is composed of consumers resident in the State of Colorado that have purchased cooking products that are made with or contain Teflon.

60.     The size of the Class is currently unknown but is estimated to be in excess of 10,000,000 consumers.

61.     The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the Court.

62.     There is a well-defined commonality of interest regarding the questions of law and fact affecting the Class.  Questions of law and fact common to the Class, among others, are:

63.     Whether the class members purchased a cooking product made with or containing Teflon.

a)  Whether DuPont represented to the public that Teflon or the use of Teflon coated cooking products was safe.

b)  Whether DuPont has denied that Teflon or the use of Teflon coated cooking products can be potentially harmful to human health.

c)  Whether DuPont had in its possession animal or human test data indicating potential adverse health effects from one or more of the chemicals found in Teflon that DuPont failed to disclose to the consuming public.

d)  Whether DuPont had in its possession blood sample test results of its workers indicating transplacental movement of one of more of the chemicals found in Teflon that DuPont failed to disclose to the consuming public.

e)  Whether DuPont had in its possession data regarding deformities suffered by the children of female DuPont employees that DuPont failed to disclose to the consuming public.

f)  Whether DuPont had in its possession information demonstrating or tending to demonstrate that PFOA may present a risk of injury to human health that DuPont failed to disclose to the consuming public.

g)  Whether the EPA advised DuPont that evidence of transplacental movement of PFOA in laboratory rats was "substantial risk data" that DuPont failed to disclose to the consuming public.

h)  Whether DuPont knew or should have known that the heating of Teflon coated cooking products can cause the release of substances harmful or potentially harmful to human health.

i)  Whether DuPont had in its possession information demonstrating or tending to demonstrate that the heating of Teflon coated cooking products can cause the release of substances harmful or potentially harmful to human health that DuPont failed to disclose to the consuming public.

j)  Whether DuPont knew or should have known that fumes from heated Teflon coated cooking products can sicken people.

k)  Whether DuPont had in its possession information demonstrating or tending to demonstrate that fumes from Teflon coated cooking products can sicken people that DuPont failed to disclose to the consuming public.

l)   Whether the class representatives' claims are sufficiently similar to the claims of prospective class members.

m) Whether the class plaintiffs no longer want to use their Teflon coated cooking products.

n)  Whether the class members have suffered damages.

64.     These common questions of law and fact are governed by the laws of the State of Colorado, where Defendant has engaged in its wrongful conduct, and predominate over questions that affect only individual Class Members.

65.     The claims of the Class Representative Plaintiff are typical of those of the Class. The Class Representative Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in litigation of this nature to represent her.  The Class Representative Plaintiff anticipates no difficulty in the management of this litigation as a Class Action.  Accordingly, the Class Representative Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

66.     A class action is the best available method for the fair and efficient adjudication of this controversy.  The Members of the Class are so numerous that the joinder of all Members is impracticable, if not impossible.  Because the harm suffered by individual Class Members, while not inconsequential, may be relatively small, the expense and burden of individual litigation makes it impractical for Members of the Class to seek redress individually for the

wrongful conduct alleged herein.  Should each individual Member of the Class be required to bring separate actions, the resulting multiplicity of lawsuits would cause undue hardship and expense on the Court and on the litigants.  The prosecution of separate actions would also create a risk of inconsistent rulings which might be dispositive of the interest of other Class Members who are not parties to the adjudications and/or may substantially impede their ability to protect their interests.

67.     To the extent such conditions exist, all conditions precedent to the maintenance of this action have been performed, have occurred, or have otherwise been waived.

**COUNT I**

**UNFAIR AND DECEPTIVE TRADE PRACTICES**

68.     Plaintiff realleges and reincorporate the allegations contained in Paragraphs 1 through 67 above as if fully set forth herein.

69.     This claim is brought pursuant to the Colorado Deceptive Trade Practices Act, C.R.S.  6-1-105, *et seq*.

70.     The Class Representative Plaintiff and the Class Members are Consumers under the Colorado Consumer Protection Act, C.R.S. 6-1.

71.     DuPont has engaged in deceptive acts or practices in the conduct of its business, which acts are unlawful pursuant to Colorado Deceptive Trade Practices Act.

72.     DuPont has engaged in bad faith and willful conduct in violation of Colorado Deceptive Trade Practices Act.

73.     DuPont knew or should have known that products containing Teflon were or are potentially harmful to consumers.

74.     DuPont failed to disclose to consumers that products containing Teflon were or are potentially harmful to consumers.

75.     DuPont failed to disclose to consumers the information it knew of relating to the adverse effects of chemicals contained in Teflon demonstrated in animal studies, the blood sample data it compiled regarding transplacental movement of chemicals contained in Teflon and the information it knew of regarding the occurrence of birth defects in the children of its female workers.

76.     DuPont knew that exposure to PFOA has caused injuries to humans and animals but concealed its knowledge of the potential dangers associated with the use of Teflon from the public and from the EPA in order to deceive customers into using and purchasing products containing Teflon.

77.     DuPont has stated repeatedly that both Teflon and PFOA are innocuous substances.

78.     DuPont has recently expressed an intention to replace PFOA in the production of Teflon by late 2006.  This fact implies that DuPont is aware of the dangers that may be associated with the use of cooking products that have been produced with Teflon and with PFOA.

79.     As a direct and proximate result of the foregoing, the Class Representative Plaintiff and other Class members have been damaged.

**WHEREFORE,** the Class Representative Plaintiff, on behalf of herself and the Class of similarly situated consumers, demands Judgment against DuPont and seeks injunctive relief requiring DuPont (i) to create a fund for ongoing medical monitoring of consumers who have

purchased cooking products containing Teflon; (ii) to create a fund for independent scientific researchers to further investigate the potential for adverse health effects to consumers who have used cooking products containing Teflon; (iii) to provide a warning label on cooking products containing Teflon regarding the potential adverse and harmful effects of using Teflon coated cooking products, and (iv) pay plaintiff an award of damages, interest, costs, and attorneys' fees; the imposition of civil penalties as allowed by statute, and an award of such other and further relief as this Court deems just and appropriate.

## COUNT II

## NEGLIGENCE

80.     Plaintiff realleges and reincorporate the allegations contained in Paragraphs 1 through 79 above as if fully set forth herein.

81.     At all times material hereto, DuPont had a duty to the Class Representative Plaintiff and to all Class Members to refrain from manufacturing a product to be used in cooking products that can pose a risk to their health or safety.

82.     DuPont has breached its duty by manufacturing Teflon, knowing it will be used in cooking products, the use of which can pose a potential danger to the health and safety of the Class Representative Plaintiff and the Class Members.

83.     As a direct and proximate result of DuPont's breach of duty, the Class Representative Plaintiff and the Class Members have been damaged.

**WHEREFORE,** the Plaintiff Class Representative, on behalf of herself and the Class Members, demands Judgment against DuPont and seeks an award of damages, interest, court costs, and such other and further relief as this Court deems just and appropriate.

**COUNT III**

**STRICT LIABILITY**

84.     Plaintiff realleges and reincorporate the allegations contained in Paragraphs 1 through 83 above as if fully set forth herein.

85.     DuPont designed, manufactured, assembled, distributed, marketed and sold Teflon for use in cooking products knowing that such products would be used without inspection for hazards.

86.     At all times material hereto, the Teflon used in cooking products was in substantially the same condition as when it left the possession of DuPont with respect to the hazards alleged below.

87.     At all times material hereto, DuPont owed a duty to design, manufacture, assemble, inspect and/or test the Teflon it manufactured, processed, and distributed in such a manner and with the exercise of reasonable care to prevent cooking products made with Teflon from releasing hazardous substances when heated.

88.     DuPont had a duty to warn consumers or intended users of Teflon coated cooking products of the potential health hazards of Teflon and PFOA which it knew or should have known of in the exercise of ordinary care, which hazards rendered the subject cooking products unreasonably dangerous to use.

89.     The Teflon manufactured, processed and distributed by DuPont, at the time it left the possession of DuPont, was hazardous and inherently dangerous for its intended use, and was unreasonably dangerous and presented and constituted a reasonable risk of danger and injury because:

a)  Teflon, when heated, can emit toxic substances, and

b)  Teflon contains substances that are likely to be carcinogenic.

90.     As a direct and proximate result of the foregoing, the Plaintiff and the Class Members have been damaged.

91.     As a direct and proximate result of the foregoing, the Class Representative Plaintiff and the Class Members were subject to the risk of the hazardous release of toxic substances from the use of cooking products containing Teflon, and bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, psychological injury, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and/or aggravation of a previously existing condition.  Any such loss would be permanent and/or are continuing in nature.

**WHEREFORE,** the Class Representative Plaintiff, on behalf of herself and the Class Members, demands Judgment against DuPont and seeks an award of damages, interest, court costs, and such other and further relief as this Court deems just and appropriate.

## COUNT IV

## NEGLIGENCE

92.     Plaintiff realleges and reincorporate the allegations contained in Paragraphs 1 through 91 above as if fully set forth herein.

93.     At all times material hereto, DuPont had a duty to use reasonable care in the manner in which it designed, manufactured, assembled, distributed, marketed and sold Teflon.

94.     At all times material hereto, DuPont had a duty to warn the consumers or intended users, including Plaintiff, of defects, which it knew or should have known in the exercise of ordinary care, which defects rendered Teflon unreasonably dangerous to use.

95.     DuPont breached its duties by negligently and carelessly designing, manufacturing, assembling, distributing, marketing and selling Teflon in the following ways:

      a)   by failing to use due care in developing Teflon for consumer use,

      b)   by failing to notify consumers of inherent dangers associated with the use of Teflon which DuPont knew or should have known of,

      c)   by failing to adequately test whether Teflon is safe for consumer use, and

      d)   by failing to adequately warn Plaintiff and the Class Members of defects which it knew or reasonably should have known of in the exercise of ordinary care.

96.     As a direct and proximate result of the foregoing, the Class Representative Plaintiff and the Class Members have been damaged.

97.     As a direct and proximate result of the foregoing, the Class Representative Plaintiff and the Class Members are subject to the risk of the hazardous release of toxic substances from the ordinary use of products containing Teflon, and bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, psychological injury, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and/or aggravation of a previously existing condition.  Any such loss would be permanent and/or are continuing in nature.

**WHEREFORE,** the Class Representative Plaintiff, on behalf of herself and the Class Members, demands Judgment against DuPont and seeks an award of damages, prejudgment and post-judgment interest, court costs, and such other and further relief as this Court deems just and appropriate.

Dated July 29, 2005

___s/Timothy R. Beyer_____
Timothy R. Beyer, #12168
BROWNSTEIN HYATT & FARBER, P.C.
410 Seventeenth Street
Twenty-Second Floor
Denver, Colorado  80202-4437
Phone: 303.223.1100
tbeyer@bhf-law.com

Attorneys for Plaintiff Susan R. Yoshioka

Plaintiff:

Susan R. Yoshioka
2940 S. Ivanhoe St.
Denver, Co.  80222